# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 2671 | DATE | 7/9/2001 |
| CASE TITLE | Shirley Chandler vs. Larry G. Massanari, Acting Commissioner of Social Security | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** Commissioner's motion for summary judgment [doc.# 21] is denied and plaintiff's motion for summary judgment [doc. # 13] is granted. This case is reversed and remanded to the Commissioner for further development consistent with this opinion, pursuant to Sentence 4, 42 U.S.C. § 405(g).

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

1 JUL 9 2001
date docketed

docketing deputy initials

7/9/2001
date mailed notice

JJK
mailing deputy initials

courtroom deputy's initials JJK

EO-7
FILED FOR DOCKETING
01 JUL -9 PM 2: 02

Date/time received in central Clerk's Office

Document Number

23

SHIRLEY J. CHANDLER,         )
                                        )
         Plaintiff,         )
                                        )    No. 00 C 2671
         vs.                )    Magistrate Judge Schenkier
                                        )
LARRY G. MASSANARI,       )
Acting Commissioner of Social Security,[1] )
                                        )
         Defendant.     )

**DOCKETED**

**JUL - 9 2001**

## MEMORANDUM OPINION AND ORDER[2]

The plaintiff, Shirley J. Chandler ("Ms. Chandler"), seeks judicial review pursuant to the

Social Security Act, 42 U.S.C. § 405(g), of a final decision by the Commissioner ("Commissioner")

of the Social Security Administration ("the Agency") denying her application for Supplemental

Social Security Income ("SSI"), pursuant to Title XVI, 42 U.S.C. § 1381 *et seq.* On August 30,

1996, Ms. Chandler filed an application for SSI, alleging a disability onset date of January 1, 1994

(R. 54). The Commissioner denied Ms. Chandler's application initially and on reconsideration (R.

24, 33).

In her application for SSI, Ms. Chandler alleged disability due to severe pain in her left

shoulder with a history of hemiarthroplasty (R.17, 133-36).[3] In a letter subsequent to the hearing,

---

[1] Larry G. Massanari, the acting Commissioner of Social Security, is substituted as defendant for Kenneth S. Apfel, the former Commissioner of Social Security. Fed.R.Civ.P. 25(d)(1).

[2] By the parties' consent, on January 16, 2001, this case was reassigned to this Court, pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule 73.1(b), to conduct any and all proceedings and to enter final judgment (doc. #s 14, 15, 16).

[3] "Arthroplasty" means "plastic surgery of a joint or of joints; the formation of movable joints." SLOANE-DORLAND'S ANNOTATED MEDICAL DICTIONARY at 63 (1987). "Hemiarthroplasty" is reconstruction of half the shoulder (with the use of a prosthesis). DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 743, 1367 (28th Ed. 1994).

Ms. Chandler's attorney submitted medical evaluations indicating that Ms. Chandler also suffered from decreased vision, decreased hearing in one ear, decreased reflexes, difficult coordination, vertigo and Meniere Syndrome (R. 160-61).[4]

On January 1, 1997, Ms. Chandler filed a timely Request for Hearing, which was held on November 17, 1997, in Chicago, Illinois (R. 11). Ms. Chandler appeared with her attorney, Ms. Kopko, and testified before an Administrative Law Judge ("ALJ") (R. 179-208). On February 13, 1998, the ALJ issued a decision finding that Ms. Chandler was not disabled at Step 4 of the Sequential Evaluation, because she could perform her past relevant work as a day care provider for newborn to 2-year old children (R. 11-18). On March 16, 2000, the Appeals Council denied review of the ALJ's decision, making this decision the final decision of the Commissioner and subject to judicial review by the district court. *See* 42 U.S.C. § 405 (g); 20 C.F.R. § 416.1481. Ms. Chandler filed a timely complaint in this Court on September 12, 2000.

Ms. Chandler has moved for summary judgment (doc. # 13), seeking reversal of the Commissioner's decision denying her claim for SSI. The Commissioner has filed a cross-motion for summary judgment in his favor (doc. # 21). For the reasons set forth below, the Court denies the Commissioner's motion for summary judgment, and grants Ms. Murray's motion to reverse and remand the Commissioner's decision pursuant to Sentence 4, 42 U.S.C. § 405(g). *See, e.g., Nelson v. Apfel,* 210 F.3d 799, 801 (7th Cir. 2000) (decision to remand for further development of administrative record or to direct an immediate award of benefits is "fact-bound determination" and is left to discretion of district court). *See also Connor v. Shalala,* 900 F. Supp. 994, 1003-04 (N.D.

---

[4] "Meniere Syndrome" is defined as "hearing loss, tinnitus, and vertigo resulting from non-suppurative disease of the labyrinth" or ringing in the ears. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 486 (28th Ed. 1994).

Ill. 1995) (remand to consider vocational expert testimony not specifically addressed by the ALJ in decision denying benefits). The Court remands the case for the ALJ to take additional evidence as may be necessary; to specifically address the medical evidence indicating that Ms. Chandler is not physically capable of lifting even 5 pounds, let alone up to 20 pounds; to specifically address evidence by the Agency's disability examiner that Ms. Chandler does not have the residual functional capacity to perform her past work as a day care provider, and testimony by the vocational expert on cross-examination that a person with severe lifting restrictions in one of her arms would have "problems" controlling "a typical two year old" (R. 207); and, as necessary, to address the question at Step 5 of whether there exists in the national economy a significant number of jobs that Ms. Chandler could perform.

## I.

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (1998). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520 (1998); *see also Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992). A finding of disability requires an affirmative answer at either Step 3 or Step 5. A negative

answer at any step (other than Step 3) precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* The ALJ's analysis at Step 5 typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform a particular category of work (*i.e.,* skilled or unskilled and sedentary, light, medium, heavy or very heavy work), as well as the availability of such work in the national economy.

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Rather, the Court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405 (g) (1988), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or ALJ), not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992).

Of course, this does not mean that the Commissioner (or ALJ) is entitled to unlimited judicial deference. The ALJ "has a basic obligation to develop a full and fair record." *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). The ALJ then must consider all relevant evidence in the record, and may not select and discuss only that evidence that favors his or her ultimate conclusion. *Herron,* 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young,* 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, *9 (N.D. Ill. 1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)).

With these standards in mind, we summarize the administrative record and the ALJ's decision.

## II.

### A.    Factual Background.

Ms. Chandler was born on August 1, 1949 (R. 54). She obtained a GED sometime in the 1970s (R. 184-85), and she completed 1-1/2 years of college (R. 145). Ms. Chandler has one son who was born in 1969, when she was 20 years old (R. 184, 204), but there is no evidence that she was ever married. Ms. Chandler testified that she lived with her mother and her stepfather as a child and then after she gave birth to her son, until he became an adult (R. 204). Although Ms. Chandler left her parents' home for a brief time in the 1990s after her son was grown, she moved back into her parents' home, where she still resides, when her mother became ill (R. 146). Although her mother

5

died in July 1997, she still lives with her stepfather who, at the time of the administrative hearing, was 75 years old (R. 184, 191).

Ms. Chandler did not work at any time until her son was approximately 20 years old, with one exception: she worked at the Spiegel Catalog Order Company during a Christmas holiday sometime in the 1970s (R. 185). Then, in approximately 1990, Ms. Chandler took an 8-week course to obtain a day care provider ("DCP") certificate (R. 186).[5] She completed the course and obtained placement as a full-time day care provider with three different families through the "Jane Adams" placement center (R. 187, 190). Ms. Chandler provided daycare services for approximately four and one-third years (R. 186-87). Her duties included taking care of babies by changing them, bathing them, feeding them, entertaining them, and making sure they were safe (R. 188). In her first placement, she provided care for an infant, but this position lasted only about four months; her net income was $175 per week (R. 187). In her second placement, she provided care for a newborn until the child was approximately 2 years old; her net income was $185 per week (R. 187). In her last placement, she again provided care for a newborn until this child was approximately 2 years old; her net income was $200 per week (R. 188). Ms. Chandler testified that the babies she cared for weighed between 5 and 7 pounds at birth (R. 189), but by the age of two, these children weighed between 20 and 30 pounds (R. 189). During the course of a day, Ms. Chandler was frequently required to lift the children, even when they had started walking (R. 189). Sometimes, she needed to lift the children above her chest to place them in the crib, because she is only 5'3" to 5'4" inches

---

[5]Ms. Chandler testified that she took the 8-week DCP course in the early 1990s, but this timing does not quite fit the time line provided by her other testimony, *e.g.*, that she worked for a little over 4 years in the early 1990s and left this work in January 1994 to care for her mother (R. 186-87, 191-92). According to the Court's calculations, this DCP course would have taken place in late 1989, not early 1990.

tall (R. 64, 207). She is also obese, weighing 219 pounds (R. 64), which makes lifting even more difficult.

Ms. Chandler testified that she left her position as a day care provider in 1994, so that she could care for her dying mother (R. 191-92).[6] Ms. Chandler injured her shoulder in a fall at approximately the same time (R. 192). Although Ms. Chandler's mother had visiting nurses, Ms. Chandler would care for her mother's non-medical needs, including the provision of food and water (R. 197). At the hearing, Ms. Chandler testified (somewhat inconsistently) that her stepfather would carry, lift and turn her mother "most" of the time, because her mother was heavy (R. 197-98). Ms. Chandler was somewhat equivocal when asked whether her father lifted her mother alone without help from her, but she finally stated that she did not help her father lift her mother at all (R. 198).

During the day, Ms. Chandler does some housework like dusting and vacuuming. She also listens to the radio (R. 198), does a lot of reading (R. 204), attends church services several times a week (R. 65, 75), cooks and washes dishes occasionally, and helps with the grocery shopping (R. 199). Although she claims it is difficult, she dresses herself (R. 199), and she can take her coat off by herself (R. 195-96). She can also feed herself and put on her own shoes (R. 200). According to Ms. Chandler, she does not have a social life, unless she goes out with her family (R. 199).

---

[6]The record is somewhat vague and inconsistent with respect to the precise date that Ms. Chandler stopped working. During a consultative examination in 1996, Dr. Fredric J. Levy ("Dr. Levy") reported that Ms. Chandler "last worked in 1992" (R. 145). However, during the administrative hearing, Ms. Chandler seemed to be saying that she stopped working when her mother became ill, and that she hurt her left shoulder shortly thereafter, sometime in 1994 (R. 191-92). The 1994 date is more consistent with Ms. Chandler's testimony that she worked some four years as a day care provider (R. 186-87) and fits more accurately with her statements regarding when she took the DCP certification course (1990 or earlier) (R. 186, 191). We need not resolve these inconsistencies in the record, but merely note them for purposes of completeness.

Ms. Chandler's financial resources are limited. She currently receives $154 each month from the Illinois Department of Public Aid, as well as food stamps (R. 55). She has no other source of income (R. 55).

## B.    Medical Evidence.

Ms. Chandler claims that she has left shoulder pain (with a history of hemiarthroplasty).[7] The medical records confirm that in 1994, Ms. Chandler underwent a left shoulder hemiarthroplasty, a surgical procedure which involves reconstruction of half the shoulder with the use of a prosthesis (R. 133-34-192). To date, there have been no further surgeries recommended or scheduled (R. 16, 182, 192, 200-01).

---

[7]One consultative medical report from Cook County Hospital, dated in 1997, indicates that Ms. Chandler also suffers from decreased vision, decreased hearing in the right ear, decreased reflexes, difficult coordination, and vertigo with a diagnosis of possible Meniere Syndrome (R. 160). Ms. Chandler did not apply for SSI claiming disability due to the ailments noted by the Cook County Hospital doctor in 1997. Since it is the claimant's burden at Steps 1 through 4 to establish a severe impairment, the Court finds that this medical evidence, submitted after the administrative hearing, is too little, too late, to establish a disability for purposes of this proceeding. Based on the single document submitted by the plaintiff, there is no reason to believe that these alleged impairments are "severe" enough to satisfy Step 2, especially given the ALJ determined that such impairments were not likely to last for 12 months. We see no evidentiary basis to overturn this finding by the ALJ. *See Herron*, 19 F.3d at 333 (court may not substitute its own judgment for that of the Commissioner); *Ehrhart*, 969 F.2d at 538 (court limited to determining whether final decision supported by substantial evidence). *See also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (no principle of administrative law or common sense requires a court to remand where there is no reason to believe the remand would lead to a different result).

In addition, during the administrative proceedings, Ms. Chandler asserted that she suffered from bronchitis and depression. The ALJ found that the bronchitis and depression were not severe impairments. The ALJ stated that the bronchitis claim was "make-weight" because there was no medical evidence in the records, other than her chronic complaints, that such a condition existed. The ALJ also noted two then-recent pulmonary studies (chest x-rays) which indicated that she had no problems (R. 14, citing Ex. 8F at 16, 19). With respect to Ms. Chandler's claims of depression, the ALJ noted that the psychological evaluations unanimously stated that Ms. Chandler's "adjustment disorder with depressed and anxious mood" was situational, "mild" and "non-severe" (R. 13-14). The ALJ therefore concluded that this medical evidence supported his finding that the alleged impairments of bronchitis and depression did not satisfy Step 2 of the sequential test (R. 14). Ms. Chandler does not challenge, and the Court accepts, the ALJ's conclusions that Ms. Chandler's claims of bronchitis and depression do not meet the severity requirements of Step 2. Thus, we need not address those claims further.

In September 1996, Dr. Waxman, one of Ms. Chandler's treating physicians, reported that she suffered from an anatomical deformity, with bone destruction and bone hypertrophy in her left shoulder (R. 133). Dr. Waxman also reported a limited range of motion in Ms. Chandler's shoulder (20 degrees forward; 10 degrees backwards; and 30 degrees sideways) (R. 134), which caused her pain (R. 133). Dr. Waxman also opined that while this condition did not affect fine manipulation or fingering, it did limit gross manipulation with her left arm (R. 134), meaning that Ms. Chandler would have "difficulty with two-handed activities, lifting heavy objects, carrying objects" (R. 134, 136). Dr. Waxman did not provide a statement specifying the amount of weight that Ms. Chandler could lift. However, in January 1997, Dr. Ham – one of Ms. Chandler's other treating physicians – opined that this condition prevents her from lifting or carrying more than 5 pounds (R. 156).

Moreover, a Residual Functional Capacity Assessment ("RFCA"), dated October 4, 1996, by a Social Security Disability Examiner, Ms. Nancy Vereen ("Ms. Vereen"), explained that an earlier RFCA by the Agency, dated October 1, 1996, indicated that Ms. Chandler could "do light work activity" (R. 22A). This earlier RFCA is not part of the current record. Although Ms. Vereen accepted the light work determination in the first RFCA, she stated that in spite of Ms. Chandler's apparent RFC to perform light work, the problems with Ms. Chandler's left shoulder limited her ability to reach in all directions, climb, and lift (R. 22A). In fact, Ms. Vereen stated in her "Disability Determination Rationale" that "it does not appear that [Ms. Chandler] could return to her past job as a Day Care Provider because this job does requires some lifting" (R. 22A). Ms. Vereen opined that there may be some other jobs Ms. Chandler could perform, such as usher and clerical services, but she did not reach any definite conclusions (R. 22A).

## C.    The Administrative Hearing.

### 1.    Ms. Chandler's Testimony.

At the administrative hearing, Ms. Chandler testified that in her previous work as a day care provider she would have to change, bathe, feed, and entertain the children and also ensure their safety (R. 188). To do all of these tasks, she would be required to lift them (R. 206-207). At birth they would weigh between 5 and 7 pounds; and by the time the babies were two years old, they would weigh between 20 and 30 pounds (R. 189).

Ms. Chandler also testified that she now has limited movement in her left shoulder and arm which prevents her from lifting, raising, stretching and twisting it without extreme pain (R. 192, 194-95). However, the ALJ noted in his opinion that Ms. Chandler was able to take her coat off at the beginning of the hearing, by using both hands, bending her arm at the elbow and raising her left arm to about mid chest level (R. 196-97). Ms. Chandler confirmed this observation at the hearing, but she also said that she cannot lift her left arm from the shoulder blade (R. 197).

Ms. Chandler had surgery on her left shoulder in 1994, immediately after she fractured her left arm in a fall (R. 192). According to Ms. Chandler, during this surgery, the doctors inserted a "pin" inserted into her shoulder, but she believes the pin has now "dropped" (R. 200-01). Ms. Chandler testified that her condition has grown worse since the surgery, rather than better, even when she takes Tylenol for pain relief (R. 193-94). Ms. Chandler also testified that, on a scale of one to ten, her pain level is a ten all the time and had been for at least a year prior to the hearing (R. 194).

10

## 2. *The Vocational Expert's Testimony.*

At the administrative hearing, a vocational expert ("VE") was called to testify regarding Ms. Chandler's former work experience, skills and residual functional capacity ("RFC"). The VE testified that Ms. Chandler's previous work as a day care provider was unskilled work at the light exertional level (R. 205). The VE then indicated that there are approximately 1600 separate sedentary and light, unskilled occupations (R. 205).

During the examination, the ALJ asked the VE to "assume" that Ms. Chandler was "capable of" doing "light exertional work" but had a limitation in her left arm, and retained only the ability to lift her non-dominant left hand to mid chest level and then bend the left elbow (R. 205). When asked whether Ms. Chandler would be capable of performing her past relevant work with these assumptions and limitations, the VE answered "yes" -- "as it is described in the D.O.T." (Dictionary of Occupational Titles), even though Ms. Chandler testified that she was lifting up to 30 pounds in her previous job as a day care provider (whereas light work only requires the ability to occasionally lift up to 20 pounds) (R. 205).[8]

On cross-examination by Ms. Chandler's attorney, however, the VE admitted that without the ability to use the non-dominant hand to lift or carry a 20 or 30 pound child, and without the ability to lift past her chest (*e.g.,* the inability to lift a child over the bannister of a crib, which would be approximately shoulder height for a woman who is 5'3" or 5'4"), Ms. Chandler "would begin to have problems . . . with more weight and certainly more . . . demands on her arm . . . ." (R. 207).

---

[8]"Light work" involves (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects. 20 C.F.R. § 404.1567(b). Social Security Ruling 83-10.

## D. The ALJ's Decision.

In his decision, the ALJ concluded that Ms. Chandler had only one severe impairment at Step 2 of the Sequential Evaluation Test: the pain in her left shoulder. The ALJ specifically found that Ms. Chandler's impairment prevented her from lifting or carrying more than 20 pounds occasionally or 10 pounds frequently, or reaching above shoulder level with her non-dominant left upper extremity (R. 14, 17). The ALJ, however, did not cite to any evidence in the record to support this lifting limitation conclusion. He merely stated in his findings that Ms. Chandler's "past relevant work as a day care provider did not require the performance of the work related activities precluded by the above limitation" -- namely, work "involving lifting or carrying more than 20 pounds occasionally or 10 pounds frequently, and reaching above shoulder level with the non-dominant left upper extremity" (R. 17).

At Step 3, the ALJ found that Ms. Chandler's impairment, while severe, did not meet or equal a listed impairment in Appendix 1, Subpart P, Regulations No. 4, specifically Listings 1.12 or 1.13, because there was no evidence of continuing surgical management or staged surgical procedures as required by the listings (R. 14-15). In fact, the ALJ stated that he had left the record open for some time after the hearing so that the claimant, who testified that she anticipated further surgery on her left shoulder, could submit medical evidence that such surgical treatment was needed and had in fact taken place (R. 16). Ms. Chandler and her attorney, however, failed to submit such records.[9]

---

[9]Instead, Ms. Chandler submitted a new medical evaluation, dated December 15, 1997, which addressed new ailments not previously claimed by Ms. Chandler as disabilities (R. 160-61), including vertigo, double vision and ringing in the ears (R. 16, 160-61). The ALJ found that these records were unrelated to Ms. Chandler's pain in her left shoulder, and that the medical evidence contained in them indicated that the neurological, sensory and motor evaluations were "entirely normal" (R. 16). The ALJ then concluded" "[w]hatever the future may portend for these allegations, at this

At Step 4, the ALJ found that Ms. Chandler had the RFC to lift or carry 10 pounds frequently and 20 pounds occasionally (R. 16). As indicated previously, the ALJ cited no evidence to support this finding (R. 16). Instead, the ALJ merely noted that Ms. Chandler's attorney submitted an RFC assessment form from her treating physician, Dr. Ham, which stated that she could not lift with her left arm, based on the fracture to this arm which occurred in 1994 (R. 16, citing Ex. 7F). The ALJ then noted that another treating physician, Dr. Waxman, indicated that Ms. Chandler had some limitation of motion in her left arm and "some atrophy due to *misuse*" but, she *did not* have any "anatomical deformities" in her left arm (R. 16, citing Ex. 3F) (emphasis added).

### III.

The ALJ determined that Ms. Chandler's lifting limitations did not preclude her from performing her prior work providing day care for children from birth to the age of two years. In so ruling, the ALJ misread the medical reports of Ms. Chandler's treating physicians, and ignored other medical and vocational evidence favorable to her claim of disability.[10]

At the outset, the Court points out that Exhibit 3F clearly states that Ms. Chandler had atrophy in her left arm due to *"disuse,"* not misuse. Moreover, this report also indicates that Ms. Chandler *did* in fact have anatomical deformities in her left arm as a result of the fracture caused by her fall in 1994 (R. 133-36) -- contrary to the ALJ's written opinion (R. 16). The ALJ also failed

---

time, and based on the examination results, I cannot find that the claimant has any impairment that is likely to last for 12 consecutive months" (R. 16).

[10]The Court also accepts the ALJ's finding that Ms. Chandler's left arm pain does not meet or equal any of the listings – in particular Listings 1.12 or 1.13, because there is "no evidence of continuing surgical management or staged surgical procedures as required by the listings" (R. 14-15). Instead, the Court addresses its analysis to the Commissioner's conclusion at Step 4 that Ms. Chandler has the RFC to perform her past relevant work as a day care provider, in spite of the severe impairment of her left shoulder.

to address Dr. Ham's RFC assessment, which indicated that Ms. Chandler not only lacked the ability to lift with her left arm, but also that this condition is so severe that she cannot even lift 5 pounds, let alone the 6 or 7 pounds necessary to hold a newborn infant of average birth weight (R. 156). The ALJ's cryptic comment that this RFC assessment was submitted by Ms. Chandler's attorney does not provide a reasoned explanation as to why it should be discredited. The fact that the report was submitted by Ms. Chandler's counsel, without more, should not carry any negative implications, since it is the claimant's burden to submit such evidence to establish a disability at Steps 1-4.

In finding that Ms. Chandler could lift up to 20 pounds occasionally, the ALJ may have relied *sub silentio* on a document entitled "Disability Determination Rationale," submitted by the Agency itself, which indicates that as of October 4, 1996, the Social Security Disability Examiner, Ms. Nancy Vereen, believed that Ms. Chandler had the RFC to perform "light work" which is defined as including the ability to lift 10 pounds frequently and 20 pounds occasionally. *See* 20 C.F.R. § 404.1567(b). But, Ms. Vereen's report further stated that Ms. Chandler's ability to do "light work" had significant limitations, including limitations on lifting and reaching. Even more relevant is the Examiner's statement that "[i]t does not appear that [Ms. Chandler] could return to her past job as a Day Care Provider because this job does require some lifting" (R. 22A).

The ALJ did not address this evidence, issued by a Social Security Disability Examiner, which flatly contradicted the VE's testimony on direct examination that Ms. Chandler could perform her prior work. It was the ALJ's responsibility to resolve this conflict; but it also was his obligation to articulate at least "at some minimal level" how he did so. *Herron*, 19 F.3d at 333. Thus, to the extent the ALJ found the VE's opinion more credible than the report by a Social Security Disability Examiner, he was required to explain why. *Id.* To the extent he merely disregarded evidence

14

supporting Ms. Chandler's claims, he acted contrary to well-settled law. *Id.* (ALJ may not choose to discuss only the evidence supporting his conclusion).

Moreover, with respect to the VE testimony, the ALJ never explained why he had the VE *assume* a light work residual functional capacity (*i.e.,* an RFC that assumed the ability to lift 10 pounds frequently and 20 pounds occasionally), when the medical evidence from Dr. Ham was inconsistent with such an assumption. The ALJ also did not acknowledge the VE's response on cross-examination by Ms. Chandler's attorney, namely, that a claimant such as Ms. Chandler, with extremely limited use of her left arm, and virtually no ability to lift, would have "problems" lifting a child -- especially a "feisty" two-year old (R. 206-07).

With no articulation, let alone a minimal articulation, of Exhibits 1A (Disability Examiner who said Ms. Chandler could not perform her past relevant work due to lifting restrictions), 7F (treating physician's RFC Assessment that Ms. Chandler is limited to lifting less than 5 pounds), and the VE's testimony on cross-examination, the ALJ's finding that Ms. Chandler can perform her past relevant work as a day care provider for children from infancy to the age of 2 years old cannot stand. Accordingly, this case must be remanded to the Commissioner for further proceedings to take additional evidence as the ALJ deems necessary; to specifically address the medical evidence that Ms. Chandler cannot lift in excess of 5 pounds, the Agency report that she cannot perform her prior work, and the VE's testimony that her limitations would create "problems" in performing that work; and to address, as needed, whether there are other jobs in significant numbers in the national economy that Ms. Chandler can perform.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for summary judgment (doc. # 21)

is denied. The plaintiff's motion for summary judgment (doc. # 13) is granted; the Commissioner's

decision is reversed, and the case is remanded for further proceedings consistent with this opinion,

pursuant to Sentence 4, 42 U.S.C. § 405(g).

ENTER:

*[signature]*

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: July 9, 2001**

16